1

2

3

4

5               UNITED STATES DISTRICT COURT

6              NORTHERN DISTRICT OF CALIFORNIA

7

8   GERRY D. WILLIAMS,                         No. C 10-1005 SI (pr)

9            Plaintiff,                        **ORDER GRANTING SUMMARY**
                                               **JUDGMENT FOR DEFENDANT**
10        v.

11  T. MILLER,

12          Defendant.
                                        /
13

14                            **INTRODUCTION**

15        Gerry Williams, a California prisoner currently housed at Kern Valley State Prison, filed

16  this *pro se* civil rights action under 42 U.S.C. § 1983, claiming that correctional officer Miller

17  retaliated against him and violated his Eighth Amendment rights while Williams was

18  incarcerated at Salinas Valley State Prison.  Miller has moved to dismiss part of the retaliation

19  claim for failure to exhaust administrative remedies and has moved for summary judgment on

20  all claims.  Williams has opposed the motions.  For the reasons discussed below, Miller's motion

21  to dismiss will be DENIED and motion for summary judgment will be GRANTED.

22

23                            **BACKGROUND**

24        The following facts are undisputed unless otherwise noted:

25        On May 29, 2007, Williams was issued Rules Violation Report (RVR) Log No. ED 07-

26  05-0054 for possession of controlled medication with the intent to distribute.  Docket # 45, p.

27  6.  Williams was placed in administrative segregation (ad-seg), pending adjudication of his

28

1  disciplinary charge.  *Id*. at 10; Docket # 1, p. 4.[1]  There is no evidence that defendant Miller was

2  involved in the preparation of the RVR.

3         "As soon as defendant T. Miller saw [Williams] in ad-seg he made some comments to

4  [Williams] about something his lawyer said about the government claim which plaintiff filed

5  against him. [¶] [Williams] told defendant T. Miller that he didn't care what his lawyer said."

6  *Id*.  In none of his filings has Williams been any more specific as to exactly what Miller said.

7  *See id.*; Docket # 53, p. 2; Docket # 60, p. 8; Docket # 61, p. 3.  Williams also has not stated

8  what the claim was about, and only presents evidence that a claim he had filed was denied by

9  the Victim Compensation And Government Claims Board in January or February 2007.

10  *See* Docket # 1-1, ¶. 4-5.

11

12  A.      The Investigative Employee

13         On June 18, 2007, defendant Miller and Correctional Officer ("C/O") Cermeno came to

14  Williams' cell.  Docket # 1, ¶. 4-5; Decl. Miller Supp. Def.'s Mot. Summ. J. (Decl. Miller) ¶ 5.

15  Miller introduced C/O Cermeno as Williams' investigative employee, who would assist

16  Williams in gathering evidence to defend against the May 29, 2007 RVR.  *See* Docket # 1, p.

17  4;  Decl. Miller ¶ 5.  Miller also explained to Williams that Cermeno had not served as an

18  investigative employee before, and that the Miller was training him.  *Id*.  The parties have

19  different accounts of how the rest of the interaction took place, although they do agree that

20  Williams eventually told Cermeno that he didn't want him as his I.E.

21         According to Williams, he "attempted to explain to C/O Cermeno that [he] needed C/O

22

23

24         [1]The RVR described the circumstances of the charged offense: during one search of Williams'
cell on May 29, 2007, 13 clonazepam pills were confiscated, and during a second search of his cell,
prison officials confiscated 50 pills of ergotamine compound that was a currently prescribed medication
25  used for headaches, several expired medications (i.e., 20 Metamucil pills, 60 Colace pills, and 30
Prilosec pills), 10 hydrocortizone pills, and 3 alcohol swab sticks that were "not issued to Inmates at
26  all."  Feudale Decl., Ex. B, p. 1.  (The continuation page that further described the circumstances was
not submitted, but the description of it in the findings indicates that, in addition to those listed above,
27  correctional officers also confiscated 20 more clonazepam pills, 60 ibuprofen pills, and 120 calcium
carbonate pills, *see* Docket # 45, p. 8.)  There is no evidence Miller had anything to do with the
28  preparation of the RVR.  Eventually, a hearing was held, Williams was found guilty of possession of
controlled medication for distribution, and assessed a credit forfeiture of 180 days.  *Id.*

1  Cermeno to interview several correctional officers as witnesses. [¶] Defendant T. Miller refused

2  to allow C/O Cermeno to accept the information [Williams] tried to present to his witnesses."

3  Docket # 1, p. 5.  Williams then told Cermeno that he did not want him as an investigative

4  employee, and Miller said he wouldn't get an investigative employee as a result.  *Id*.; *see also*

5  Docket # 61, p. 3 (when Miller wouldn't allow Cermeno "to accept my list of witnesses I refused

6  Cermeno as my I.E.").[2]  Williams does not dispute that he became argumentative during the

7  encounter.

8         Although he refused C/O Cermeno, Williams did receive an I.E.  According to the RVR,

9  C/O J. Lopez was assigned as an investigative employee. C/O Lopez interviewed Williams,

10 gathered information from witnesses, asked witnesses specific questions posed by Williams, and

11 prepared a report, a copy of which he provided to Williams more than 24 hours prior to the

12 hearing.  *See* Docket # 45, p. 7.

13

14 B.    The Laundry Exchange

15        The standard protocol for a laundry exchange requires staff to use two carts: a dirty

16 clothes cart and a clean clothes cart.  The standard protocol for laundry exchange is that the

17 correctional officers issue a one-for-one exchange, where the inmate can exchange one dirty item

18 for a clean item of the same kind.

19        The parties disagree about the circumstances of the laundry exchange that was done on

20 July 15, 2007.  According to Williams, Miller "issued plaintiff dirty, stinky and fungus infested

21 clothing which he got from another inmate during clothing exchange at ad-seg."  Docket # 1, ¶.

22

23        [2]Defendant Miller's version of the same encounter is as follows: Williams asked C/O Cermeno
   to make photocopies of the list of questions that he wanted Cermeno to ask his witnesses. Decl. Miller,
24 ¶ 6.  Miller informed Williams that under SVSP's photocopying policy, Williams had to request
   photocopies from the law librarian and that the cost of copies would be withdrawn from his trust
25 account.  *Id*.  Upon hearing this, Williams became irate and accused Miller of lying about the
   photocopying policy and improperly influencing C/O Cermeno. *Id*. at 7.  Miller asked Williams to calm
26 down and to refrain from speaking to officers in an irate manner.  *Id*. Williams ignored Miller's orders
   and refused to accept Cermeno as his investigative employee.  *Id*.  Due to Williams' unruly behavior,
27 Miller terminated the conversation and both he and C/O Cermeno left.  *Id*.  When, as here, the parties
   disagree about the facts, the court accepts the non-movant's version as true for purposes of summary
28 judgment.

3

1    5-6. Williams states that the other inmate was housed in another section of the building and "had

2    a terrible odor that could be smelt (sic) from the outside of his cell whenever one walked by."

3    *Id*. at 6. According to Williams, Miller left with Williams' clothing and went to section A and

4    was there for about eight minutes, before returning with clothes. *Id.* Notwithstanding the

5    alleged stench that Williams claims was discernable when merely walking by the other inmate's

6    cell, Williams claims to have put on the t-shirt and boxer shorts and worn them for a half hour

7    before discovering that the clothes were "dirty, stinky, and infested with fungus." *Id*. Williams

8    now "suffers from some type of rash and bumps on his body and under his arms," which he

9    attributes to having worn the t-shirt and boxer shorts that were "dirty, stinky and infested with

10   fungus." *Id*. at 6-7. He submitted medical records from 2008-2010 that showed he had ongoing

11   care for underarm rash, as well as for scalp problems and foot rashes. *See* Docket # 60-5. One

12   of his 2010 medical records shows that he complained that he wanted to see a dermatologist "for

13   rash under arms since 2006," which predated the laundry exchange. Docket # 60-5, p. 2.[3]

14        The parties agree that Williams never informed Miller that the clothes were dirty or

15   malodorous or fungus-infested.

16

17   C.     Access To Exercise Yard

18        C/O Miller refused to allow Williams to enter the exercise yard on July 9, 2007. Docket

19   # 1, p. 7; Miller Decl., ¶ 9. (Williams contends this problem persisted for five days, Docket #

20   1, p. 7, but the parties present evidence only about the first day.) In his inmate grievance dated

21   July 11, 2007, Williams wrote: "On July 9, 2007, C/O Miller, T. G. refused to allow subject

22   access to the ad-seg walk-a-lone exercise yard because subject refused to leave his heart

23   medication (nitro glycerin pills) behind and requested to take it with him to the yard." Docket

24   # 1, Ex. E; *see also* Docket # 61, p. 2.

25        Miller explained that he refused to let Williams into the yard because Williams

26

27        [3]Miller provides a different version of the events. According to him, he followed standard
     protocol for laundry exchange, and issued a clean t-shirt and pair of clean boxer shorts from the clean
28   clothes cart. Miller Decl., ¶¶ 14-15. For purposes of summary judgment, the court accepts the non-
     movant's version as true.

1    "attempted to bring a small pouch containing four or five pills of varying shapes and sizes."

2    Decl. Miller, ¶ 9. Miller "believed that Williams was attempting to bring this mixed bag of pills

3    into the yard to smuggle drugs or sell prescription medication." *Id.*

4         "Inmates who require medication are required to carry their medication in its original

5    packaging. Requiring the original packaging enables officers to ensure that the medication

6    properly belongs to the inmate and that the medication has not expired (in order to prevent

7    improper hoarding). [Miller] conferred with [his] supervisor about this policy, who confirmed

8    that Williams could only enter the yard with medication if it was in its proper container." Miller

9    Decl., ¶ 10. When Miller told Williams that the medication needed to be in its original container

10   if he wanted to bring it onto the yard, "Williams became agitated and told [Miller] that he could

11   not enter the yard without his pills. [Miller] told him again that he could only bring out pills in

12   their original container. Rather than place the pills in the original container, Williams chose not

13   to go to the yard that day." *Id.* at ¶ 11.

14

15                            **VENUE AND JURISDICTION**

16        Venue is proper in the Northern District of California because the events or omissions

17   giving rise to the claim occurred at Salinas Valley in Monterey County, which is located within

18   the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction

19   over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

20

21                                  **DISCUSSION**

22   A.    Motion to Dismiss

23        Miller contends that Williams' claim that he was denied outdoor exercise in retaliation

24   for his First Amendment activities should be dismissed because Williams failed to exhaust

25   administrative remedies.

26        "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983],

27   or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility

28   until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The

                                             5

1   State of California provides its inmates and parolees the right to appeal administratively "any

2   policy, decision, action, condition, or omission by the department or its staff that the inmate or

3   parolee can demonstrate as having a material adverse effect upon his or her health, safety, or

4   welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  It also provides its inmates the right to file

5   administrative appeals alleging misconduct by correctional officers. *See id.* § 3084.1(e).  Under

6   the regulations that existed in 2007-2008, in order to exhaust available administrative remedies

7   within this system, a prisoner was required to proceed through several levels of appeal: (1)

8   informal resolution, (2) formal written appeal on a CDC 602 inmate appeal form, (3) second

9   level appeal to the institution head or designee, and (4) third level appeal to the Director of the

10  California Department of Corrections and Rehabilitation.  *See id.* at former § 3084.5; *Woodford*

11  *v. Ngo*, 548 U.S. 81, 85-86 (2006).[4]

12      Exhaustion in prisoner cases covered by § 1997e(a) is mandatory.  *Porter v. Nussle*, 534

13  U.S. 516, 524 (2002).  All available remedies must be exhausted; those remedies "need not meet

14  federal standards, nor must they be 'plain, speedy, and effective.'"  *Id.* (citation omitted).  Even

15  when the prisoner seeks relief not available in grievance proceedings, notably money damages,

16  exhaustion is a prerequisite to suit.  *Id.*; *Booth v. Churner*, 532 U.S. 731, 741 (2001).  Failure

17  to exhaust is an affirmative defense under the PLRA, and inmates are not required to specially

18  plead or demonstrate exhaustion in their complaints.  *Jones v. Bock*, 549 U.S. 199, 216 (2007).

19  "In deciding a motion to dismiss for a failure to exhaust nonjudicial remedies, the court may look

20  beyond the pleadings and decide disputed issues of fact."  *Ritza v. Int'l Longshoremen's &*

21  *Warehousemen's Union*, 837 F.2d 365, 368 (9th Cir. 1988).

22      "The level of detail in an administrative grievance necessary to properly exhaust a claim

23  is determined by the prison's applicable grievance procedures."  *Jones v. Bock*, 549 U.S. at 218.

24  In California, prisoners are required to lodge their administrative complaint on a CDC Form 602,

25  which requires only that the prisoner "describe the problem and action requested."  Cal. Code

26

27

28      [4]The regulations governing inmate grievances were amended, effective January 28, 2011. *See*
    note following 15 Cal. Code Regs. § 3084.5.  The amendments that occurred after Williams' grievance
    activities are not relevant here.

1    Regs. tit. 15, § 3084.2(a).  Where a prison's grievance procedures do not specify the requisite

2    level of factual specificity required in the grievance, "'a grievance suffices if it alerts the prison

3    to the nature of the wrong for which redress is sought.'"  *Griffin v. Arpaio*, 557 F.3d 1117, 1120

4    (9th Cir. 2009) (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).   Thus, in

5    California, "[a] grievance need not include legal terminology or legal theories unless they are

6    in some way needed to provide notice of the harm being grieved.  A grievance also need not

7    contain every fact necessary to prove each element of an eventual legal claim.  The primary

8    purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay

9    groundwork for litigation."  *Id*. at 1120; *accord Morton v. Hall*, 599 F.3d 942, 946 (9th Cir.

10   2010).

11          The parties agree that Williams' administrative appeal that focused only on denial of

12   outdoor activities, Inmate Appeal No. SVSP-07-03313, was not pursued to the Director's level

13   and did not satisfy the exhaustion requirement.  *See* Docket # 1, ¶. 30-31 (Docket # 1, Ex. E).

14   The issue thus is whether a different inmate appeal that did receive a Director's level decision,

15   i.e., Inmate Appeal No. SVSP-07-03394, sufficed to exhaust the retaliatory-denial-of-outdoor-

16   exercise claim.   *See* Docket # 1, ¶. 20-22 (Docket # 1, Ex. D).  Having reviewed the latter

17   grievance, the court concludes that it was sufficient to exhaust administrative remedies.  In that

18   inmate appeal, Williams wrote that "Miller's retaliatory conduct continues and nothing has been

19   done about it."  *Id*. at 20.  Williams described Miller's particular acts that he thought were

20   retaliatory: "To date, C/O Miller has obstructed subject's access to an investigative employee .

21   . ., *obstructed subject's access to the exercise yard*, and issued subject dirty clothing all in

22   retaliation against subject for filing a government claim against him."  *Id*. at 20, 22 (emphasis

23   added).  In the "action requested" part of the form, Williams requested an order "to prevent C/O

24   Miller from any further retaliatory conduct" and money.  *Id.* at 20.  The inmate appeal definitely

25   focused more on the dirty clothes, but the mention of the denial of outdoor exercise as one of the

26   incidents in an alleged retaliation campaign was sufficient to exhaust it.  A prisoner who actually

27   wants relief would help himself greatly by making his grievance as clear as possible, but the

28   administrative exhaustion requirement does not require the optimal presentation of a claim.

7

1   Williams' Inmate Appeal No. SVSP-07-03394 that contended that Miller had retaliated against

2   Williams by giving him dirty clothes, obstructing his access to an I.E., and denying him outdoor

3   exercise sufficed to "alert[] the prison to the nature of the wrong for which redress is sought,"

4   *Griffin*, 557 F.3d at 1120.  The motion to dismiss for non-exhaustion is DENIED.

5

6   B.      Motion for Summary Judgment

7          1.      Legal Standard for Summary Judgment

8          The court will grant summary judgment "against a party who fails to make a showing

9   sufficient to establish the existence of an element essential to that party's case, and on which that

10  party will bear the burden of proof at trial . . . since a complete failure of proof concerning an

11  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

12  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*,

13  477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under

14  governing law, and a dispute about a material fact is genuine "if the evidence is such that a

15  reasonable jury could return a verdict for the nonmoving party").

16         Generally, as is the situation with defendant's challenge to the Eighth Amendment and

17  retaliation claims, the moving party bears the initial burden of identifying those portions of the

18  record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts

19  to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the

20  'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing

21  that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (citations omitted).

22         Where, as is the situation with defendant's qualified immunity defense, the moving party

23  bears the burden of proof at trial, the moving party must come forward with evidence which

24  would entitle him to a directed verdict if the evidence went uncontroverted at trial.  *See*

25  *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a

26  genuine issue of fact on each issue material to the affirmative defense.  *Id.* at 1537; *see also*

27  *Anderson*, 477 U.S. at 248.  When the defendant-movant has come forward with this evidence,

28  the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine

8

1   issue of fact on the defense.

2       A verified complaint may be used as an opposing affidavit under Rule 56, as long as it

3   is based on personal knowledge and sets forth specific facts admissible in evidence. *See*

4   *Schroeder v. McDonald*, 55 F.3d 454, 460 & nn. 10-11 (9th Cir. 1995) (treating plaintiff's

5   verified complaint as opposing affidavit where, even though verification not in conformity with

6   28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct,

7   and allegations were not based purely on his belief but on his personal knowledge). Plaintiff's

8   complaint is verified and therefore may be considered as evidence.

9       The court's function on a summary judgment motion is not to make credibility

10  determinations or weigh conflicting evidence on a disputed material fact. *See T.W. Elec. Serv.*

11  *v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be

12  viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from

13  the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

14

15      2.    Analysis

16      Miller moves for summary judgment, arguing that there are no genuine issues of material

17  fact and that he is entitled judgment as a matter of law.  Specifically, he moves for summary

18  judgment on three retaliation claims (i.e., being denied outdoor exercise, being obstructed in

19  access to an investigative employee, and being issued foul clothing) and an Eighth Amendment

20  claim.  Miller also moves for summary judgment on qualified immunity grounds.

21

22      a.    Retaliation Claims

23      Prisoners may not be retaliated against for exercising their right of access to the courts.

24  *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995).  "Within the prison context, a viable

25  claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state

26  actor took some adverse action against an inmate (2) because of (3) that prisoner's protected

27  conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and

28  (5) the action did not reasonably advance a legitimate correctional goal ." *Rhodes v. Robinson*,

9

1   408 F.3d 559, 567–68 (9th Cir. 2009) (footnote omitted).  Plaintiff has the burden of showing

2   that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor

3   behind the defendant's actions,  and that the actions advanced no legitimate penological interest.

4   *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Hines v. Gomez*,

5   108 F.3d 265, 267-68 (9th Cir. 1997) (inferring retaliatory motive from circumstantial evidence).

6   As to the fourth element, i.e., whether the inmate was chilled from exercising his First

7   Amendment rights, a prisoner-plaintiff may allege that he suffered more than minimal harm

8   "since harm that is more than minimal will almost always have a chilling effect." *Rhodes*, 408

9   F.3d at 567–68 n.11.  That a prisoner's First Amendment rights were chilled, though not

10  necessarily silenced, is enough.  *Id*. at 569.  The proper analysis is whether a person of ordinary

11  firmness would be chilled or silenced from exercising future First Amendment rights.  *Id*. at 568.

12          Courts should treat retaliation claims by inmates "with skepticism and particular care"

13  because "virtually any adverse action taken against a prisoner by a prison official—even those

14  otherwise not rising to the level of a constitutional violation—can be characterized as a

15  constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001),

16  *overruled on other grounds* by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  Retaliation

17  claims brought by prisoners must be evaluated in light of concerns over "excessive judicial

18  involvement in day-to-day prison management, which 'often squander[s] judicial resources with

19  little offsetting benefit to anyone.'" *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting

20  *Sandin v. Conner*, 515 U.S. 472, 482 (1995)).  In particular, courts should "'afford appropriate

21  deference and flexibility' to prison officials in the evaluation of proffered legitimate penological

22  reasons for conduct alleged to be retaliatory." *Id*.

23

24                          i.      Denial Of Outdoor Exercise.

25          Miller argues that he is entitled to summary judgment on Williams' retaliation claim

26  related to denial of outdoor exercise because his actions furthered legitimate penological

27  interests.

28          The evidence is undisputed that, on July 9, 2007, Miller refused to allow Williams access

1    to the ad-seg exercise yard because he carried an assortment of pills in a container other than

2    their original packaging and refused to leave them in his cell.  The evidence is undisputed that

3    Miller's actions were based on prison policy which required inmates to keep their medications

4    in the original packaging to allow staff to confirm that each medication properly belonged to the

5    inmate and had not expired.  It also is undisputed that Miller conferred with his supervisor, who

6    confirmed that Williams could only enter the yard with medications in their proper containers.

7    It is undisputed that prison policy required inmates to have pills in their original containers or

8    packaging to, inter alia, prevent drug trafficking.  It is undisputed that Miller notified Williams

9    that medications needed to be in their original containers if he wanted to bring them into the

10   yard.  Williams presents no evidence that Miller would not have allowed him into the exercise

11   yard if the pills were in the original containers.  Miller presented evidence that he thought that

12   Williams was attempting to bring this mixed bag of pills onto the yard to smuggle or sell– not

13   an unreasonable thought in light of the fact that Williams was in ad-seg awaiting resolution of

14   a drug possession charge.

15       Williams does not provide any evidence to dispute Miller's contention that regulating

16   inmate medication to prevent drug trafficking is a legitimate penological interest.   State

17   regulations make it illegal for inmates to use or possess controlled substances that were not

18   prescribed to them.  *See* Cal. Code. Regs. tit. 15, § 3016.  Additionally, federal courts recognize

19   a State's interest in preventing drug trafficking within prison walls.  *See Bell v. Wolfish*, 441 U.S.

20   520, 540 (1979) ("[T]he Government must be able to take steps to maintain security and order

21   at the institution and make certain no weapons or illicit drugs reach detainees."); *see also Friend*

22   *v. Kolodzieczak*, 923 F.2d 126 (9th Cir. 1991) (finding limitations on means by which inmates

23   obtain drugs a logical connection to a legitimate penological interest).

24       Williams contends he attempted to bring into the yard nitroglycerin pills, which he was

25   instructed to keep with him at all times because he was experiencing severe chest pain and

26   palpitations.  He does not deny he possessed a variety of pills in a container that was not the

27   original packaging.  While the pills Williams attempted to bring into the exercise yard may have

28   included his heart medication, Williams presents no evidence that, on that specific day, he

11

1    carried only prescribed heart medication or that even the heart medication was in the original

2    packaging.

3        Williams contends other officers (whom he does not identify) allowed him to carry his

4    nitroglycerin pills in a small brown bottle.  Williams' contention that other officers allowed him

5    to take pills in a small brown bottle does not raise an inference that Miller's insistence on

6    original packaging was retaliatory, in light of the prison policy that pills had to be kept in their

7    original containers.  *See Pratt*, 65 F.3d at 807 (court should afford deference to prison officials

8    in evaluating the proffered penological purposes).  Even if one assumes that other guards

9    allowed Williams to carry nitroglycerin in a small brown bottle, he offers no evidence that they

10   let him bring an assortment of different kinds of pills in that bottle.  The other guards'

11   permissiveness does not raise a triable issue of fact that Miller was not reasonably advancing

12   legitimate penological goals when he insisted that Williams place the pills in their original

13   containers.  Further, Williams presents no evidence that he would have been denied access to

14   the exercise yard had he brought the pills in their original container(s) or had he returned to his

15   cell and placed the pills in their original container(s).

16       The undisputed evidence shows that Miller's refusal to allow Miller to bring an

17   assortment of pills to the exercise yard reasonably advanced the State's legitimate goal of

18   preventing drug trafficking within prison walls.  Viewing the evidence and the reasonable

19   inferences therefrom in the light most favorable to Williams, no reasonable jury could find in

20   his favor on the retaliation claim with regard to the denial of outdoor exercise.  Miller is entitled

21   to summary judgment on this claim.

22

23                    ii.    Retaliation Claim Related to Alleged Interference With the
                            Disciplinary Process
24
25   Miller contends that he is entitled to summary judgment on this retaliation claim because

26   the state tort claim was not the "substantial" or "motivating" factor behind the denial of an

27   investigative employee and because he had a legitimate penological reason for terminating

28   Williams' encounter with C/O Cermeno.

1   The evidence is undisputed that, on June 18, 2007, Miller and C/O Cermeno came to
2   Williams' cell and told him that C/O Cermeno was to be his I.E. on the May 29, 2007 RVR.  The
3   evidence is undisputed that Miller terminated the encounter when Williams told C/O Cermeno
4   that he did not want him as his I.E. and was argumentative.  Williams does not provide any
5   evidence to dispute that Miller's termination of the conversation once the argumentative
6   Williams refused C/O Cermeno reasonably advanced legitimate penological reasons.  Prison
7   security is a compelling government interest.  *See Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13
8   (2005).  Courts must accord wide-ranging deference to prison administrators in their efforts to
9   preserve internal order and discipline and to maintain institutional security.  *Bell*, 441 U.S. at
10   547.

11   Williams states that after he told C/O Cermeno that he did not want him as his I.E., Miller
12   stated,  "you lost your I.E. You don't get one."  Docket # 1, Ex. C.  In light of the context in
13   which the statement was made -- i.e., after the inmate refused the investigative employee offered
14   -- the denial of an investigative employee does not support a reasonable inference that the
15   investigative employee actually was denied for the different purpose of retaliating against
16   Williams because of his protected conduct that occurred a year earlier.  Williams does not
17   dispute that it would have been proper for a correctional officer to terminate a conversation with
18   an I.E. once the inmate refused to accept the offered I.E.

19   Williams contends that timing can be circumstantial evidence of retaliatory intent, and
20   that the timing here supports a "causal link" between the state tort claim, Williams'
21   reconfinement in ad-seg, and Miller's retaliatory behavior.  Docket # 60, p. 8; *see Pratt v.
22   Rowland*, 65 F.3d at 808.  Williams alleges the retaliation started as soon as Miller saw him back
23   in ad-seg and made "some statement about the State Board of Control Claim [Williams] filed
24   against [Miller] on a prior confinement in Ad-Seg."  *Id.*  Williams alleges that the statements
25   were "about something [Miller's] lawyer said about the State Board of Control claim."  Docket
26   # 61, at ¶ 5.  Williams does not, however, provide any evidence to show exactly what Miller said
27   to him, and whether anything Miller said suggested his intent to retaliate. Williams' evidence
28   about Miller's statement really only shows Miller's awareness of the state claim that had been

13

1    filed and does not establish or show a triable issue on the causation element.

2          Williams also has not established or shown a triable issue of fact that Miller's conduct

3    had any chilling effects.  In fact, the evidence shows that, after Miller terminated that encounter

4    upon Williams' rejection of C/O Cermeno as his I.E., Williams was assigned another I.E.  That

5    new I.E., C/O Lopez, interviewed Williams, gathered information from witnesses, asked them

6    specific questions posed by Williams, prepared a report, and provided a copy to Williams.

7          Viewing the evidence and the reasonable inferences therefrom in the light most favorable

8    to Williams, no reasonable jury could find in his favor on the retaliation claim with regard to the

9    alleged interference with the disciplinary process.  Miller is entitled to summary judgment on

10   this claim.

11

12                         iii.      Retaliation Claim Related to Alleged Issuance of Dirty Clothing

13         Miller moves for summary judgment on Williams' retaliation claim related to the alleged

14   issuance of foul clothing.  He urges that, even if it happened, such conduct would not have been

15   enough to chill the speech of a person of ordinary firmness.

16         The parties agree that Miller gave Williams a shirt and boxer shorts during the laundry

17   exchange.  Williams contends that the clothes came from a specific malodorous inmate in

18   another section of the housing unit, but fails to provide any evidence to show that this is

19   anything but speculation by him.  His evidence indicates that he surmised that the shirt and

20   shorts came from that inmate, but he does not state that he could see the other section of the

21   housing unit or that he saw Miller obtain the clothes from that inmate.

22         There is no evidence that Miller was aware of any fungus infestation in the shirt and

23   shorts he gave to Williams.  That the clothes were infested appears to be mere speculation by

24   Williams, as he has provided no evidence that the fungus was readily apparent from merely

25   examining the clothes.  With no evidence that Miller knew the clothes were fungus infested, a

26   reasonable jury could not conclude that he acted with retaliatory purpose in giving the shorts and

27   shirt to Williams.  That is, if one person gives to another person a contaminated object while

28   unaware of its contaminated nature, a reasonable person would not view that exchange as done

14

1  with the intent to harm the recipient.

2      Unlike the alleged fungus infestation, dirt and smell *are* attributes that can be detected

3  by lay people without difficulty.  Here, Williams contends that the clothes were dirty and

4  malodorous, yet admits that he put them on and wore them for a half hour before even noticing

5  that they were dirty and malodorous.  His own conduct strongly suggests that neither the dirt nor

6  the smell was overwhelming or even readily apparent. Even accepting Williams' version of the

7  facts – i.e., that Miller knew the clothes were dirty and malodorous – Williams does not raise

8  a triable issue of fact that a single instance of being given dirty and malodorous clothes in a

9  laundry exchange would chill or silence a person of ordinary firmness from pursuing future First

10  Amendment activities.  *Cf. Rhodes v. Robinson*, 408 F.3d at 569 (destruction of inmate's

11  property and assaults on the inmate enough to chill First Amendment rights and state retaliation

12  claim, even if inmate filed grievances and a lawsuit).  Further, even if they were dirty and

13  malodorous, Williams only wore the clothes for half an hour.  The harm of wearing two articles

14  of clothing for half an hour before discovering that the clothes were dirty and malodorous is not

15  "anything more than a mere inconvenience lasting only a relatively brief period." *See Martin*

16  *v. Loadholt*, No. 1:10-cv-00156-LJO-MJS (PC), 2012 WL 1081081 at *3 (E.D. Cal. Mar. 30,

17  2012).  This inconvenience would not deter a person of ordinary firmness from pursuing First

18  Amendment activities.  Miller is entitled to summary judgment on this claim.

19

20          b.      Eighth Amendment Claim

21      Williams contends that Miller purposefully issued him foul clothing, which caused a

22  recurring rash under his arms and that spread to his head at one point. Docket # 1, p. 10; Docket

23  # 61, at  ¶ 11.  He contends that Miller's action constitutes cruel and usual punishment in

24  violation of the Eighth Amendment.  Miller moves for summary judgment on this Eighth

25  Amendment claim, arguing that receiving two articles of foul clothing is not a sufficiently

26  serious deprivation and that he did not knowingly disregard a risk to Williams' health or safety.

27      A plaintiff alleging that conditions of confinement amount to cruel and unusual

28  punishment prohibited by the Eighth Amendment must satisfy a two-prong test. *Wilson v. Seiter*,

1  501 U.S. 294, 298 (1991).  First, a plaintiff must satisfy an objective test showing that "he is

2  incarcerated under conditions posing a substantial risk of serious harm."  *Farmer v. Brennan*,

3  511 U.S. at 834.  In determining whether a deprivation of a basic necessity is sufficiently serious

4  to satisfy the objective component of an Eighth Amendment claim, courts consider the

5  circumstances, nature, and duration of the deprivation.  *See Johnson v. Lewis*, 217 F.3d 726, 731

6  (9th Cir. 2000).  Second, the plaintiff must prove that the prison official inflicted the deprivation

7  with a "sufficiently culpable state of mind," that is, with "deliberate indifference" to his health

8  or safety.  *Farmer*, 511 U.S. at 834.

9        The Supreme Court has recognized that "exposure of inmates to a serious, communicable

10  disease" constitutes a substantial risk of harm for the purposes of an Eighth Amendment claim.

11  *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see generally Johnson v. Illinois Dept. of Corr.*,

12  CIV. 04-222-MJR, 2006 WL 741318, at *7 (S.D. Ill. Mar. 22, 2006) ("the denial of personal

13  hygienic items" eventually causing "jock itch and foot fungus"); *Williams v. Manilla*, No. 98 CV

14  5639, 2000 WL 1307769, at *5 (N.D.Ill. Sep.12, 2000) ("some kind of chronic and severe rash"

15  giving rise to "numerous open sores, bleeding, and a spreading of the problem").

16        If the clothes were merely dirty or malodorous, there clearly would not be an objectively

17  serious risk to Williams' health.  The question here is whether the evidence supports a

18  reasonable inference that Williams was exposed to a fungus.  The evidence is undisputed that

19  Williams did not identify any problem with the clothing until he wore them for half an hour.

20  Williams does not provide any evidence that the clothes were fungus-infested but only

21  speculates that they were.  Williams provides no contemporaneous medical records to suggest

22  causation.  All of his medical records were generated long after the incident.  The earliest

23  medical record mentioning the rash is dated May 26, 2008 – ten months after the accident.  *See*

24  Docket # 60-5, p. 8.  Moreover, one of his records show that Williams told one nurse that the

25  rash had started in 2006, which suggests he had the rash before the laundry exchange incident.

26  Williams does not provide any evidence that the source of his current rash was ever determined

27  to be a consequence of the clothes he wore for half an hour in 2007.  Viewing the evidence and

28  the reasonable inferences therefrom in the light most favorable to Williams, no reasonable jury

1 | could find that he was exposed to conditions posing a substantial risk of serious harm.

2 | To prevail on a deliberate indifference claim, the plaintiff also must establish that the

3 | defendant knew of and disregarded an excessive risk to the plaintiff's health and safety. *Farmer*,

4 | 511 U.S. at 837. The question of knowledge of a substantial risk is "a question of fact subject

5 | to demonstration in the usual ways, including inference from circumstantial evidence, and a

6 | factfinder may conclude that a prison official knew of a substantial risk from the very fact that

7 | the risk was obvious." *Id*. at 842 (citation omitted). However, "using circumstantial evidence

8 | to prove deliberate indifference requires more than evidence that the defendants should have

9 | recognized the excessive risk and responded to it; it requires evidence that the defendant must

10 | have recognized the excessive risk and ignored it." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 138

11 | (3d Cir. 2001).

12 | Williams provides no evidence that Miller knew that the clothes were fungus-infested or

13 | that they presented a substantial risk of serious harm. The evidence is undisputed that Williams

14 | never notified or complained to Miller of any problem with the clothes. Although Williams

15 | states that he complained to C/O Machuca and other correctional officers about the clothing,

16 | Williams does not state that he specifically notified Miller about the clothing. *See* Docket # 1,

17 | p. 6. Whether Williams complained to other correctional officers is immaterial, because there

18 | is no evidence that they relayed the information to Miller, and did so before Williams put the

19 | clothes on and was exposed to the alleged fungus. There simply is no evidence that would allow

20 | a reasonable trier of fact to find that Miller knew the clothes were fungus-infested, or that he

21 | gave the clothes to Williams in knowing disregard of their alleged fungus infestation.

22 | Williams has failed to establish or raise a triable issue that receipt of the clothes exposed

23 | him to an objectively serious condition, and has failed to establish or raise a triable issue that

24 | Miller acted with deliberate indifference to a known risk to his health in giving him the clothes.

25 | *Wilson*, 501 U.S. at 303. Viewing the facts in the light most favorable to Williams, Miller is

26 | entitled to summary judgment on the Eighth Amendment claim.

27

28

1              c.      Qualified Immunity

2          The defense of qualified immunity protects "government officials . . . from liability for

3 civil damages insofar as their conduct does not violate clearly established statutory or

4 constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

5 457 U.S. 800, 818 (1982).  In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth

6 a two-pronged test to determine whether qualified immunity exists.  First, the court asks: "Taken

7 in the light most favorable to the party asserting the injury, do the facts alleged show the officer's

8 conduct violated a constitutional right?" *Id.* at 201.  If no constitutional right was violated if the

9 facts were as alleged, the inquiry ends and defendants prevail.  *See id.*  If, however, "a violation

10 could be made out on a favorable view of the parties' submissions, the next, sequential step is

11 to ask whether the right was clearly established. . . .   'The contours of the right must be

12 sufficiently clear that a reasonable official would understand that what he is doing violates that

13 right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established

14 is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

15 he confronted." *Id.* at 201-02 (quoting *Anderson v. Creighthon*, 483 U.S. 635, 640 (1987)).

16 Although *Saucier* required courts to address the questions in the particular sequence set out

17 above, courts now have the discretion to decide which prong to address first, in light of the

18 particular circumstances of each case.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

19          As discussed in the preceding sections, the evidence in the record does not establish a

20 violation of Williams' constitutional rights.  Miller prevails on the first step of the *Saucier*

21 analysis.  Even if a constitutional violation had been shown, however, Miller would prevail on

22 the second step of the *Saucier* analysis.  No reasonable prison official would have believed that

23 denying yard access for a prisoner with a variety of pills not in their original containers,

24 terminating an encounter with an investigative employee that the prisoner had rejected, or

25 issuing clothing not known to be contaminated would violate the law.  Miller is entitled to

26 judgment as a matter of law on the qualified immunity defense.

27 /  /  /

28

18

1

**CONCLUSION**

2          For the foregoing reasons, defendant's motion to dismiss is DENIED and motion for

3   summary judgment is GRANTED. (Docket # 44).  Defendant is entitled to judgment as a matter

4   of law on the merits of the retaliation and Eighth Amendment claims and on his defense of

5   qualified immunity.  Judgment will be entered in defendant's favor and against plaintiff.

6          The clerk will close the file.

7

8          IT IS SO ORDERED.

9

Dated: March 15, 2013                         _____

10                                              SUSAN ILLSTON
                                                United States District Judge
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19